Douglass A. Mitchell
Nevada Bar No. 3775
BOIES, SCHILLER & FLEXNER LLP
300 South Fourth Street, Suite 800
Las Vegas, NV 89101
Tel: (702) 382-7300
Fax: (702) 382-2755

Courtney R. Rockett (pro hac vice forthcoming)
Ian M. Dumain (pro hac vice forthcoming)
Ievgeniia Vatrenko (pro hac vice forthcoming)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
Tel:  (914) 749-8200
Fax:  (914) 749-8300

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| Freestream Aircraft (Bermuda) Limited and Alireza Ittihadieh, | ) ) ) |
| Plaintiffs, | ) ) ) |
| vs. | ) ) ) |
| Aero Law Group and John Schmidt, | ) ) ) |
| Defendants. | ) ) ) ) |

CASE NO.:  16-cv-1236

COMPLAINT

Jury Trial Demanded

Plaintiffs Freestream Aircraft (Bermuda) Limited and Alireza Ittihadieh allege as follows:

**INTRODUCTION**

1.      This case is about defamation in the $20 billion business jet market.  Plaintiff Freestream Aircraft (Bermuda) Limited ("Freestream") is a full-service aircraft company that serves clients in all aspects of aircraft brokerage, acquisition, marketing, sales, custom design

1

services, import/export, and maintenance review.  Plaintiff Alireza Ittihadieh founded the Freestream operations in 1992, which have been in continuous operation since then.

2. Like in many markets, reputation is critical in the business jet market.  The private aviation market is an especially tight-knit community of buyers, sellers, and interconnected service providers, making the favor and goodwill of market participants an invaluable part of Freestream's business.  Freestream has long enjoyed a good reputation within the market.

3. Since at least 2014, however, Freestream's reputation has been under attack by Defendant John Schmidt, a partner at Aero Law Group.  Schmidt has been falsely stating that a particular transaction structure that Freestream sometimes employs is illegal and unethical.  Schmidt has further falsely suggested that this transaction structure—known as a back-to-back transaction—is the only type of transaction structure that Freestream uses in its business.

4. In 2014, Schmidt interfered with the imminent sale of an aircraft from Freestream to Blue City Holdings LLC—the private aviation arm of Google's founders.

5. At that time, Schmidt told Russell Fischer, Director of Maintenance at Blue City, that Freestream was built entirely on back-to-back transactions, which Schmidt said were illegal and unethical.  Schmidt urged Blue City to discontinue all business with Freestream and Ittihadieh.

6. Schmidt's statements were false.  Freestream's business was not then and is not now built entirely on back-to-back transactions.  And back-to-back transactions are neither illegal nor unethical.

7. After the Blue City transaction collapsed, Freestream wrote to Aero through counsel and demanded that Schmidt and his colleagues stop defaming Freestream.  But Schmidt didn't.

8. On June 25, 2015, at the "Isle of Man Aviation Conference: Finance, Tax, Regulation, Registration," Schmidt told Masha Shvetsova, who Schmidt understood to be a potential Freestream client, that back-to-back transactions are "quite possibly illegal;" that if she worked with Freestream or Ittihadieh, she "was going to be led" to engage in a back-to-back transaction; and that it was Schmidt's belief that back-to-back transactions were "ripe" for criminal prosecution in the United States.

9. On November 18, 2015, Schmidt told Marwan Khalek, Group CEO of Gama Aviation, that all of the elements of criminality were present in back-to-back transactions and that he was surprised the United States Department of Justice had not prosecuted people engaged in back-to-back transactions.

10. In the same conversation, Schmidt told Shvetsova and Khalek that it was "completely unethical" for a broker representing a client to engage in back-to-back transactions.

11. Schmidt's false statements about the nature, scope, illegality and unethicality of Freestream and Ittihadieh's business practices have harmed Freestream.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000 exclusive of interests and costs.

13. This Court has personal jurisdiction over Aero and Schmidt because they committed torts in Nevada.

14. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this Complaint took place in this district.

## THE PARTIES

15. Plaintiff Freestream is corporation formed under the laws of Bermuda with a principal place of business in Hamilton, Bermuda.

16. Plaintiff Alireza Ittihadieh is Freestream's founder and member of the board of directors. He is a citizen of the United Kingdom, and he resides in Crans-Montana, Switzerland.

17. Defendant Aero Law Group is a professional corporation based in Bellevue, Washington. It regularly solicits business in Nevada, including by participating in industry meetings and conventions in the state.

18. Defendant John Schmidt is a partner at Aero Law Group resident in Bellevue, Washington. He regularly solicits business for Aero in Nevada, including by participating in industry meetings and conventions in the state. Some of the tortious conduct at issue in this suit was committed by Schmidt in Nevada at one such industry meeting.

## ALLEGATIONS

**Freestream**

19. Freestream is a full-service aircraft company that serves clients in all aspects of aircraft brokerage, acquisition, marketing, sales, custom design services, import/export and maintenance review. Ittihadieh founded Freestream in 1992. Freestream is a leading broker of Boeing Business Jets, which can trade for more than $50,000,000.00 a piece.

20. Since its founding, Freestream has closed hundreds of complex aircraft deals, and has fulfilled several substantial government contracts. It has been granted high-levels of government security clearances.

**Back-to-back transactions**

21. In its business, Freestream has participated in direct-sale transactions and back-to-back transactions, among others.

22. In a direct-sale transaction, one or more brokers connect a seller of an aircraft with a buyer. The buyer and seller then contract directly with each other. The brokers in this direct-sale model are typically paid a commission based on the sale price of the aircraft.

23. In a back-to-back transaction, the broker or an affiliate acts as both an interim buyer and interim seller of the aircraft. That is, if the back-to-back broker is aware of a potential buyer of a certain type of aircraft, and she also is aware of a potential seller of that type of aircraft, then she or an affiliate buys the aircraft from the seller and sells on to the buyer. The purchase and sale agreements are negotiated simultaneously and are "mirror images" of each other so that the broker can require everything that she needs to provide to her ultimate buyer in the way of representations and warranties, warranty of title, scope of inspection, delivery conditions, governing law and venue for resolving disputes, and the like. The pre-purchase inspections and closings are virtually simultaneous.

24. Traditional principles of contract law concerning transparency and misrepresentation protect buyers and sellers in back-to-back transactions just as they would in a direct sale transaction.

25. The broker's compensation in a back-to-back transaction is the difference between the broker's purchase price from the original seller and her sale price to the end buyer. The broker's compensation in a back-to-back transaction will not necessarily differ from what she would have earned in a direct sale for the same asset.

26. Market participants of all types and sizes regularly use the back-to-back transaction structure to buy and sell private aircrafts.

27. There are many reasons why parties to an aircraft transaction may choose a back-to-back transaction structure instead of a direct sale structure.

28. From a seller's perspective, the back-to-back structure has at least the following advantages:

- The seller can take a hands-off approach by selling at or above a certain price, without haggling over details like the broker's commission. For example, a bank selling a repossessed aircraft may only be interested in receiving a certain minimum price.

- The seller limits its liability by not being in the chain of title to the subsequent buyer.

- The seller avoids dealing with an unknown party.

- A buyer who has acquired title to a work-in-progress aircraft or who is otherwise under contract to purchase but no longer desires to acquire the aircraft (and thus is a seller) can contract with another buyer before taking delivery of the aircraft, bypassing restrictions that may prevent the buyer from assigning its rights in the aircraft.

29. And from a buyer's perspective, the back-to-back structure has at least the following advantages:

- The buyer can avoid negotiating over broker costs.

- The buyer who is familiar with the broker avoids dealing with an unknown party.

- The buyer can maintain anonymity.

- The buyer can acquire an aircraft from a seller who might otherwise object to a sale to the buyer on personal/competitive reasons (an issue that is more common than one might expect in the small circle of buyers of private jets at a certain price level).

30. For these and other reasons, back-to-back transactions serve the legitimate goals of market participants. Back-to-back transactions also increase the liquidity of the market, are ethical, and are legal in the United States and in all jurisdictions in which Freestream operates. In fact, Schmidt and Aero have themselves participated in back-to-back transactions.

**Schmidt and Aero spread falsehoods about Freestream's business**

31. All of that notwithstanding, Schmidt and Aero have tarred Freestream in the marketplace by repeatedly stating that back-to-back transactions are illegal and unethical and suggesting to market participants that Freestream engages only in back-to-back transactions.

32. Aero had an incentive to undermine Freestream's efforts to develop business in the small community of aircraft purchasers. Ittihadieh and Freestream do not use Aero for legal services or refer clients to it. And Aero frequently represents brokers that compete with Freestream, and refers clients to those brokers instead.

33. Beginning no later than 2014, Schmidt and Aero began interfering with Freestream's business by making false statements about Freestream's business practices to market participants.

34. In 2014, Schmidt interfered with the imminent sale of a Boeing Business Jet ("BBJ") from Freestream to Blue City Holdings LLC—the private aviation arm of Google's founders. The purchase price of the aircraft was $52,000,000.00.

35. At that time, Schmidt told Russell Fischer, Director of Maintenance at Blue City, that Freestream was built entirely on back-to-back transactions, which Schmidt said were illegal and unethical and urged Blue City to discontinue all business with Freestream and Ittihadieh.

36. The Blue City transaction was not consummated.

37. After the Blue City transaction collapsed, Freestream wrote to Aero through counsel and demanded that Schmidt and his colleagues stop defaming Freestream. In a letter dated June 5, 2014, Freestream specifically refuted any suggestion that Freestream's business was built entirely on back-to-back transactions, calling the assertions "patently false."

38. Aero responded on June 13, 2014. In its letter, Aero—through founding partner Kevin Austin—noted that it was in the midst of at least two transactions with Freestream. But it did not deny interfering with the Blue City transaction or spreading falsehoods about Freestream. In a later letter, Austin would state only that *to his knowledge* nobody at Aero had ever stated or implied that Freestream's business was built entirely on back-to-back transactions.

39. Notwithstanding Freestream's warning, Schmidt's defamation of Freestream continued unabated.

40. On June 25, 2015, Schmidt made false and defamatory statements to Masha Shvetsova, who Schmidt understood to be an agent for potential buyers of a BBJ.

41. At the "Isle of Man Aviation Conference: Finance, Tax, Regulation, Registration," Shvetsova asked Schmidt about Freestream and Ittihadieh. Shvetsova said she understood that, among the three brokers she said she had seriously considered so far, Freestream had the most extensive experience in brokering BBJ sales.

42. When Shvetsova told Schmidt she was leaning towards using Ittihadieh and Freestream, Schmidt told her that she was "going to be led" to a back-to-back transaction.

8

43. Later in the discussion, Shvetsova asked whether back-to-back transactions were legal. Schmidt's response was "it's quite possibly illegal." He added that he believed back-to-back transactions were "ripe" for criminal prosecution, "but it has not happened yet."

44. When Shvetsova then asked why brokers used the back-to-back transaction structure if they were illegal or close to being illegal, Schmidt said, without qualification or other explanation, "it's extremely lucrative."

45. Schmidt made similar comments at the NBAA 2015 Annual Meeting and Convention in Las Vegas, Nevada, which took place between November 17 and November 19, 2015.

46. On November 18, 2015, Schmidt met again with Shvetsova. This time they were joined by Marwan Khalek, CEO of Gama Aviation. Gama is a global business aviation services company offering its clients a wide portfolio of support services. Gama is a public company, and it had over $400 million in revenue in 2015. Its services include aircraft and fleet management, special mission support, logistics support, charter, maintenance, design and modification, fixed-base operations, and software.

47. In a discussion with Khalek and Schmidt, Schmidt replied to both Shvetsova and Khalek that a back-to-back transaction "will be a part of" Freestream's representation of her buyer, and that "[Ittihadieh] will try to structure it that way." Schmidt told them that clients "would be significantly disadvantaged by that, all the things we talked about [in our last meeting]."

48. During this meeting, Schmidt all but ignored the fact that Freestream and Ittihadieh do not exclusively engage in back-to-back transactions. And he repeatedly linked

Freestream to what he characterized as illegal and unethical business behavior through criticism of the exclusive use of back-to-back transactions.

49.  Shvetsova reminded Schmidt that he had previously said that back-to-back transactions were "illegal, essentially." Schmidt confirmed adding that he was surprised the U.S. Department of Justice had not yet started criminal prosecutions for back-to-backs. Schmidt added, "there are violations here."

50.  Likewise, later in the conversation, when Khalek again asked for clarification on whether back-to-back transactions were illegal, Schmidt replied, "I obviously get a strong sense of that in the U.S. law." Schmidt added that while he was licensed to practice only in the United States, "the principles [of the illegality of back-to-backs] remain the same" in other countries. Schmidt told them that, at "some point one of these transactions is going to lead to legal action."

51.  In addition to statements about Ittihadieh and Freestream violating the law, Schmidt also made multiple statements that accused Ittihadieh and Freestream of violating their duties of loyalty to their clients.

52.  Schmidt told both prospective clients that "a back-to-back, almost by definition, is violating anything to do with loyalty." When Khalek asked how that could be, Schmidt replied that if a broker takes an undisclosed commission, "that right there is violating the duty of loyalty to the client."

53.  Schmidt continued that taking an undisclosed commission would violate the ethical rules of the Washington state bar. This was patently misleading because the ethical rules for members of the Washington state bar have nothing to do with the law applying to brokers in aircraft transactions. Nevertheless, Schmidt told them charging an undisclosed commission would be "enough to be disbarred" in his home state.

54. Schmidt also went on to state that Freestream and Ittihadieh's business was unethical in other ways. He described back-to-backs as "washing [the purchase of the aircraft] through" without the broker adopting any risk. He also suggested that without taking an ownership interest, a back-to-back broker is not "a real, bona fide seller." When Khalek inquired about any "ethical issues" in back-to-back transactions, Schmidt stated that such transactions were "completely unethical."

55. In fact, contrary to Schmidt's assertions, a broker who engages in a back-to-back transaction does not, without taking an additional self-interested and dishonest action, violate the duty of loyalty to his client. While a broker may act dishonestly in executing a back-to-back transaction, this is true for any transaction in which there is an intermediary between buyer and seller, and the back-to-back nature of the transaction does not in and of itself facilitate such dishonesty.

## CLAIM I
### (Defamation Per Se)

56. Plaintiffs incorporate the allegations set forth in Paragraphs 1 through 55.

57. Schmidt and Aero have made false and defamatory statements about Plaintiffs.

58. Schmidt and Aero's false and defamatory statements about Plaintiffs were unprivileged, and published to third parties.

59. Schmidt and Aero's false and defamatory statements concerned Plaintiffs' lack of fitness for trade, business, or profession.

60. Schmidt and Aero's false and defamatory statements tended to injure Plaintiffs in their business.

61. Schmidt and Aero acted at least negligently.

62. Schmidt was acting within the scope of his employment and in furtherance of the interests of Aero.

63. Plaintiffs have suffered actual and presumed damages in an amount in excess of $75,000 and which will be proven at trial.

64. Because Schmidt and Aero have been guilty of oppression, fraud or malice, express or implied, Plaintiffs, in addition to the compensatory damages, are entitled to damages for the sake of example and by way of punishing them.

65. Aero and Schmidt have acted without just cause or excuse, interfered with the carrying of on Plaintiffs' business, and harmed their profits, thus doing an irreparable injury.

## CLAIM II
### (Defamation)

66. Plaintiffs incorporate the allegations set forth in Paragraphs 1 through 55.

67. Schmidt and Aero have made false and defamatory statements about Plaintiffs.

68. Schmidt and Aero's false and defamatory statements about Plaintiffs were unprivileged, and published to third parties.

69. Schmidt and Aero acted at least negligently.

70. Schmidt was acting within the scope of his employment and in furtherance of the interests of Aero.

71. Plaintiffs have suffered actual and presumed damages in an amount in excess of $75,000 and which will be proven at trial.

72. Because Schmidt and Aero have been guilty of oppression, fraud or malice, express or implied, Plaintiffs, in addition to the compensatory damages, are entitled to damages for the sake of example and by way of punishing them.

73. Aero and Schmidt have acted without just cause or excuse, interfered with the carrying of on Plaintiffs' business, and harmed their profits, thus doing an irreparable injury.

## CLAIM III
### (Business Disparagement)

74. Plaintiffs incorporate the allegations set forth in Paragraphs 1 through 55.

75. Schmidt and Aero have made false and disparaging statements about Plaintiffs' business.

76. Schmidt and Aero's false and disparaging statements about Plaintiffs' business were unprivileged, and published to third parties.

77. Schmidt and Aero acted with malice, in that they had either the intent to cause harm to the Plaintiffs' pecuniary interests, or they published their disparaging remarks knowing those remarks were false or with reckless disregard for the truth of the remarks.

78. Schmidt was acting within the scope of his employment and in furtherance of the interests of Aero.

79. As a proximate cause of Schmidt and Aero's false and disparaging statements about Plaintiffs' business, Plaintiffs have suffered special damages in an amount in excess of $75,000 and which will be proven at trial.

80. Because Schmidt and Aero have been guilty of oppression, fraud or malice, express or implied, Plaintiffs, in addition to the compensatory damages, are entitled to damages for the sake of example and by way of punishing them.

81. Aero and Schmidt have acted without just cause or excuse, interfered with the carrying of on Plaintiffs' business, and harmed their profits, thus doing an irreparable injury.

## CLAIM IV
### (Tortious Interference with Prospective Business Advantage)

82. Plaintiffs incorporate the allegations set forth in Paragraphs 1 through 55.

83. As set out above, Plaintiff had prospective contractual relationships with others in the private aviation market.

84. Schmidt and Aero were aware of those prospective contractual relationships.

85. Schmidt and Aero intended to harm Plaintiffs by preventing those prospective contractual relationships from being consummated.

86. Schmidt and Aero's conduct was without justification or privilege.

87. Schmidt was acting within the scope of his employment and in furtherance of the interests of Aero.

88. As a result of Schmidt and Aero's conduct, Plaintiffs have suffered damages in an amount in excess of $75,000 and which will be proven at trial.

89. Because Schmidt and Aero have been guilty of oppression, fraud or malice, express or implied, Plaintiffs, in addition to the compensatory damages, are entitled to damages for the sake of example and by way of punishing them.

90. Aero and Schmidt have acted without just cause or excuse, interfered with the carrying of on Plaintiffs' business, and harmed their profits, thus doing an irreparable injury.

## DEMAND FOR RELIEF

Plaintiffs request the following relief:

A. A trial by jury;

B. An award of appropriate permanent injunctive relief, including but not limited to an order requiring Aero Law and all its employees, agents, representatives, and all persons acting in concert, cooperation, or concern with it, including but not limited to Schmidt, to cease making

false and defamatory statements about Freestream Bermuda or Ittihadieh to any of Freestream Bermuda's existing or prospective business contracts;

      C.     An award of compensatory and punitive damages in an amount to be proved at trial;

      D.     All costs and expenses to which Plaintiffs are entitled, including reasonable attorneys' fees to the extent permitted by law;

      E.     Pre-judgment and post-judgment interest; and

      F.     Such other and further relief the Court deems appropriate.

Dated: June 3, 2016
       Las Vegas, Nevada

                      Respectfully submitted,

                      By: /s/ Douglass A. Mitchell
                            Douglass A. Mitchell
                            Nevada Bar No. 3775
                            BOIES, SCHILLER & FLEXNER LLP
                            300 South Fourth Street, Suite 800
                            Las Vegas, NV 89101
                            Tel: (702) 382-7300
                            Fax: (702) 382-2755

                            Courtney R. Rockett (pro hac vice forthcoming)
                            Ian M. Dumain (pro hac vice forthcoming)
                            Ievgeniia Vatrenko (pro hac vice forthcoming)
                            BOIES, SCHILLER & FLEXNER LLP
                            333 Main Street
                            Armonk, NY 10504
                            Tel: (914) 749-8200
                            Fax: (914) 749-8300

                            Attorneys for Plaintiffs